USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 6, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
NORCAST, S.ÀR.L.,                                           :
                                                            :    Case Nos.
                              Plaintiff,                    :    12 Civ. 4973 (PAC)
                                                            :
     -against-                                              :
                                                            :
CASTLE HARLAN, INC.,                                        :    OPINION & ORDER
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

  Plaintiff Norcast S.àr.l.'s Amended Complaint asserts various claims that Defendant Castle Harlan, Inc. misrepresented its intentions in negotiating for the purchase of Norcast's subsidiary, Norcast Wear Solutions, Inc. ("NWS"). Neither party, however, seeks adjudication of the merits of the dispute in this Court. Instead, Defendant moves to dismiss and/or stay the action in favor of international arbitration; and Plaintiff cross-moves to remand the action to the New York State Supreme Court, to recover attorneys' fees, and to modify the Confidentiality and Protective Order dated January 19, 2012. In essence, the Court is asked to direct the case to the appropriate forum and to determine whether discovery materials that have already been produced for a related case in Australia should now be available for Norcast to use in this dispute. For the reasons set forth below, Defendant's motion to compel arbitration is DENIED, Plaintiff's cross-motion is GRANTED with no attorneys' fees, and the Confidentiality and Protective Order is modified.

**BACKGROUND**

**A.  The Parties and the Underlying Dispute**

Plaintiff Norcast is a holding company incorporated and headquartered in Luxembourg. (Am. Compl. ¶¶ 9, 14.)  Defendant Castle Harlan is a private equity firm incorporated in Delaware and headquartered in New York.  (*Id.* ¶ 10.)  Non-party Bradken Limited ("Bradken") is an Australian corporation that manufactures and supplies mining consumable products.  (*Id.* ¶ 18.)  Non-party NWS is a Canadian corporation that manufactures and supplies cast products for the mining industry, and competed against Bradken.  (*Id.* ¶¶ 1, 15.)  Prior to its sale in July 6, 2011, NWS was a wholly-owned subsidiary of Norcast.  (*Id.* ¶ 17.)  Non-party 0913034 B.C. Ltd. ("BC") was a Canadian "special purpose subsidiary" of Castle Harlan which purchased NWS from Norcast before Castle Harlan six days later sold BC to Bradken.  (*Id.* ¶¶ 1, 70.)

More simply, Norcast sold its subsidiary, NWS, to Castle Harlan's subsidiary, BC; and then Castle Harlan promptly resold those subsidiaries to NWS's competitor.  The gravamen of Norcast's Amended Complaint is that Castle Harlan improperly concealed from Norcast its plans to resell NWS to Bradken, and that if Norcast had known of the plan to resell to a competitor, it would have insisted on a higher sale price.  (*See id.* ¶¶ 1, 75.)

The dispute initially came before this Court when Norcast filed an application for judicial assistance under 28 U.S.C. § 1782, seeking the right to issue a subpoena to Castle Harlan for discovery materials to be used in Norcast's actual or proposed litigation in Australia against Bradken.  *See* Case No. 11-MC-00251.  The Court ordered production of certain materials, subject to a confidentiality and protective order.

**B.  The Arbitration Clauses at Issue**

Norcast filed a separate action against Castle Harlan in New York State Supreme Court,

but Castle Harlan removed that action to this Court, seeking an order compelling international arbitration under Chapter 2 of the Federal Arbitration Act ("FAA"). Castle Harlan contends that there are two arbitration clauses applicable to this dispute. While there is no contract between Castle Harlan and Norcast that contains an arbitration agreement, Castle Harlan attempts to tease one out of contracts that each has signed with *other* entities, in order to avoid judicial resolution of this dispute.

### 1. The London Arbitration Clause in the Confidentiality Agreement and the Exclusivity Letter

The first arbitration clause is in a Confidentiality Agreement, dated March 15, 2011, signed by Castle Harlan and NWS, governing the use of information that NWS would provide to Castle Harlan in contemplation of a potential sale. (*See* Nelson Decl. Ex. B.) The Agreement provides that "any dispute, controversy or claim between any Parties hereto arising out of, relating to or in connection with this Agreement" is subject to arbitration in London and defines the "Parties" as Castle Harlan and NWS. Norcast was not a party to the Confidentiality Agreement, and the Agreement specifically states that it has no third-party beneficiaries.

Nevertheless, Castle Harlan contends that another agreement, an Exclusivity Letter, dated June 1, 2011, is a basis for Norcast's obligation to arbitrate under the Confidentiality Agreement's arbitration clause. (*See* Nelson Decl. Ex. C.) The Letter was signed by Castle Harlan, NWS, Norcast, and Norcast's parent company, Pala Investments Holdings Limited; and it provides for a period during which Norcast and its affiliates would "negotiate exclusively with Castle Harlan in respect of the Proposed Transaction." It also refers to the Confidentiality Agreement as follows:

> The parties acknowledge and agree that the execution and delivery of this exclusivity letter and its contents constitute "Confidential Information" for the

> purposes of the confidentiality agreement (the "Confidentiality Agreement") dated March 15, 2011 between Castle Harlan and the Company and may only be disclosed in the circumstances set forth in the Confidentiality Agreement; provided that [NWS] and Castle Harlan hereby agree that the Confidentiality Agreement is hereby amended by [including "sources of financing" in the definition of a "Representative" with whom Castle Harlan could share Confidential Information].

Castle Harlan thus argues that the Exclusivity Letter that Norcast signed incorporated by reference the Confidentiality Agreement's London arbitration clause. Both agreements contain clauses choosing New York law to govern their interpretation.

Castle Harlan also argues that Norcast is estopped from denying the application of the arbitration clause in the Confidentiality Agreement because the Amended Complaint "evinces a claim that Norcast had some kind of expectation or entitlement based on the Confidentiality Agreement." (Def.'s Op. Br. 16.) Castle Harlan refers to the following allegations in Norcast's Amended Complaint:

- "[Norcast's banker] UBS took a different approach [to confidentiality] with direct competitors of NWS (such as Bradken), who were potential strategic purchasers. For example, UBS did not initially distribute teasers to them, because the teaser contained non-public information regarding the business of NWS. The initial disclosure of non-public information regarding NWS to a competitor such as Bradken would create substantial risks to NWS's business, insofar as a competitor who did not have a genuine interest in acquiring NWS could obtain and utilize this information to NWS's detriment, and this could in turn negatively affect the sales process for NWS." (Am. Compl. ¶ 25.)

- "Due to the historically close relationship between Castle Harlan and Bradken, Norcast informed UBS in the beginning of March 2011 that it had to be diligent to ensure that Bradken did not obtain confidential or non-public information relating to Norcast through Castle Harlan." (Am. Compl. ¶ 31.)

- "[A] sophisticated purchaser such as Bradken would never have spent AUS $202 million on a transaction without having access to confidential due diligence materials and conducting a thorough due diligence of the acquisition target." (Am. Compl. ¶ 72.)

Nonetheless, Castle Harlan notes that "Norcast has eschewed any claim that Castle Harlan breached the Confidentiality Agreement . . . ." (Def.'s Op. Br. 16 n.13.) Indeed, Castle Harlan

itself "does not accept that it assumed any substantive obligations to Norcast when the Confidentiality Agreement was signed . . . ."  (*Id.* at 3 n.3.)

### 2. The Toronto Arbitration Clause in the Share Purchase Agreement

Next, Castle Harlan claims that the Share Purchase Agreement ("SPA") between Norcast and BC is a basis to compel arbitration.  The SPA provides that "any dispute, controversy or claim between any Parties hereto arising out of, relating to or in connection with this Agreement" is subject to arbitration in Toronto and defines the "Parties" as Norcast and BC.  (SPA §§ 1.1, 12.14.)  With certain irrelevant exceptions,[1] the SPA states that it has no third-party beneficiaries:

> [Norcast] and [BC] intend that this Agreement will not benefit or create any right or cause of action in favour of any Person, other than the Parties. . . . [N]o person, other than the Parties, shall be entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum.

(*Id.* § 12.5.)  The SPA's choice-of-law clause refers to the law of "Ontario and the federal laws of Canada applicable therein" to govern its interpretation.  (*Id.* § 12.13.)

Castle Harlan is not a signatory, and there is no third-party beneficiary, but nonetheless it argues that it can enforce the SPA's arbitration clause on an agency theory since the Amended Complaint alleges that "Castle Harlan made all of the [alleged] fraudulent misrepresentations and omissions to Norcast on behalf of its subsidiary, BC."  (Def.'s Op. Br. 22 (quoting Am. Compl. ¶ 127).)  In addition, Castle Harlan contends that Norcast is estopped from denying the applicability of the Toronto arbitration clause "given the close interconnectedness between

---

[1] Those exceptions include Norcast's obligation to indemnify BC, NWS, and NWS's subsidiaries for certain liabilities (*see* SPA § 10.2); BC's obligation to indemnify Norcast for certain liabilities (*see* SPA § 10.3); and BC's obligation to prevent NWS or NWS's subsidiaries from amending their charters or bylaws relating to director-and-officer indemnification (*see* SPA § 11.2).  Significantly, none of these exceptions create any rights for the benefit of Castle Harlan.

[Norcast's] fraud theory and the SPA signed by Norcast and B.C., and since Norcast alleges a close link between B.C. and Castle Harlan." (Def.'s Op. Br. 23 n.19.)

## DISCUSSION

I.  **Legal Standards for Cross-Motions to Compel Arbitration and Remand**

   A.  **Subject Matter Jurisdiction**

The sole asserted basis for subject matter jurisdiction in this case is Chapter 2 of the FAA, which grants original and removal jurisdiction to federal district courts for cases "falling under" the Convention on the Recognition and Enforcement of Foreign Arbitral Awards[2] (the "Convention"). 9 U.S.C §§ 203, 205. A dispute subject to a commercial arbitration agreement "falls under" the Convention if the agreement has "a reasonable relation with one or more foreign states." 9 U.S.C. § 202.

Here, there is no dispute that the arbitration agreements at issue would "fall under" the Convention, if they were applicable to the parties. Norcast is a foreign corporation, and the arbitration clauses call for arbitration in London and Toronto. The question, however, is whether either of the arbitration clauses obligate Norcast to arbitrate its dispute with Castle Harlan. If not, then there is no remaining basis for federal jurisdiction, and pursuant to 28 U.S.C. § 1447(c) the Court must remand the case to New York State Supreme Court. *See, e.g.*, *Holzer v. Mondadori*, No. 12-CV-5234, 2013 WL 1104269, at *6 (S.D.N.Y. Mar. 14, 2013).

   B.  **Enforcement of Arbitration Agreements**

      1. **Standard of Review**

For motions to compel arbitration under the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175

---

[2] June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. *See generally* 9 U.S.C § 201 *et seq.* (codifying the Convention).

(2d Cir. 2003). "Allegations related to the question of whether the parties formed a valid arbitration agreement . . . are evaluated to determine whether they raise a genuine issue of material fact . . . ." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). Nonetheless, the Court "accept[s] as true . . . factual allegations in the plaintiff['s] complaint that relate to the underlying dispute between the parties." *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2013 WL 5202824, at *4 (S.D.N.Y. Sept. 16, 2013) (quoting *Schnabel*, 697 F.3d at 113). Where, as here, "the parties rely entirely on documentary evidence," all of which is before the Court, "the issue whether these communications together establish an agreement to arbitrate . . . thus appears to be . . . an issue suitable for judicial resolution at the threshold." *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 424 (S.D.N.Y. 2012).

### 2. The Federal Arbitration Act

"[T]he FAA's primary purpose [is] ensuring that private agreements to arbitrate are enforced according to their terms." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). "The Act was designed to . . . place [arbitration] agreements upon the same footing as other contracts." *Id.* at 474 (citations and internal quotation marks omitted). "Despite the 'liberal federal policy favoring arbitration agreements,' 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (citations omitted). Thus, courts should not "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

Indeed, the U.S. Supreme Court has recently reemphasized that "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify *with whom*

[the parties] choose to arbitrate their disputes.'" *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (citations omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasizing "the foundational FAA principle that arbitration is a matter of consent"). Thus, where "the parties dispute not the scope of an arbitration clause but whether an obligation to arbitrate exists, the [FAA's] presumption in favor of arbitration does not apply." *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011). Accordingly, "in deciding whether a contractual obligation to arbitrate exists, 'courts should generally apply state-law principles that govern the formation of contracts.'" *Id.*

Notwithstanding the contractual basis for the enforcement of arbitration clauses, "'traditional principles' of state law allow a[n] [arbitration agreement] to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel . . . .'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Accordingly, "the black letter rule that the obligation to arbitrate depends on consent" is consistent with the proposition that "consent need not always be expressed in a formal contract made with the party demanding arbitration." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361–62 (2d Cir. 2008).

## II.   Applicability of the Confidentiality Agreement's London Arbitration Clause

Norcast did not sign the Confidentiality Agreement, but Castle Harlan asserts that Norcast is obligated under its London arbitration clause for two reasons. First, Castle Harlan points out that Norcast *did* sign the Exclusivity Letter, which Castle Harlan argues incorporated the Confidentiality Agreement by reference. Second, Castle Harlan argues that Norcast is estopped from denying the applicability of the arbitration clause because Norcast seeks to enjoy the benefits of the Confidentiality Agreement in which the clause appears. Neither argument

withstands scrutiny under the circumstances.

### A. Incorporation by Reference

"Under New York law, 'the initial interpretation of a contract 'is a matter of law for the court to decide.'" *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). "New York courts interpret arbitration agreements in the same way that they do other agreements—to give effect to the parties' intent and reasonable expectations based on the language used in the agreement." *Di Martino v. Dooley*, No. 08-CV-4606, 2009 WL 27438, at *5 (S.D.N.Y. Jan. 6, 2009) (citing cases). For the terms of a separate agreement to be incorporated by reference, "[i]t must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid." *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006) (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)).[3] Even where a contract incorporates by reference certain provisions of another contract, that reference does not alone demonstrate the parties' intent to incorporate other terms not expressly referenced. *See, e.g.*, *U.S. Steel Corp. v. Turner Const. Co.*, 560 F. Supp. 871, 874 (S.D.N.Y. 1983); *Int'l Aviation Svcs. of N.Y., Inc. v. Flagsim Co., Inc.*, 352 N.Y.S.2d 223, 224 (App. Div. 2d Dep't 1974).

---

[3] As Norcast correctly notes, some cases state that "[u]nder New York law, 'while an agreement to arbitrate can be incorporated by reference, any such reference must clearly show such an intent to arbitrate.'" *Indus. Window Corp. v. Fed. Ins. Co.*, 609 F. Supp. 2d 329, 337 (S.D.N.Y. 2009) (quoting *In re Aerotech World Trade. Ltd. v. Excalibur Sys., Inc.*, 654 N.Y.S.2d 386, 387 (App. Div. 2d Dep't 1997)). In particular, New York courts have required that such a reference must evince a "'clear, explicit and unequivocal' agreement to arbitrate"—a "rigid standard[]" that cannot "depend upon implication or subtlety." *Gen. Ry. Signal Corp. v. L.K. Comstock & Co., Inc.*, 678 N.Y.S.2d 208, 209 (App. Div. 4th Dep't 1998). There is some question, however, about whether the FAA preempts these standards because they appear to impose a higher standard for arbitration agreements than for contracts in general. *Compare Indus. Window Corp.*, 609 F. Supp. 2d at 337 (applying New York's arbitration-specific rule), *with Clarendon Nat. Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 519 (S.D.N.Y. 2001) (stating that "[t]he Court of Appeals for the Second Circuit has explicitly held that Section 2 of the FAA preempts that rule," citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993)). The Court need not decide the question because it concludes that, under either standard, the arbitration agreement is not incorporated by reference.

Here, the references in the Exclusivity Letter to the Confidentiality Agreement do not clearly indicate Norcast's consent to arbitrate.  Although the Letter states that "*[t]he parties* acknowledge and agree" that the Letter was "'Confidential Information' for the purposes of the confidentiality agreement," the very same sentence reiterates that the Confidentiality Agreement is "*between Castle Harlan and [NWS]*."  Furthermore, the Letter states that *NWS and Castle Harlan* are the entities agreeing to amend the Confidentiality Agreement.  (Ltr. 2 ("[NWS] and Castle Harlan hereby agree that the Confidentiality Agreement is hereby amended . . . .").)  True, the single long sentence at issue in the Letter contains a limitation, phrased in the passive voice, that the Letter could only "be disclosed" subject to the Confidentiality Agreement.  But this indefinite reference does not clearly evince Norcast's consent to be subject to the Confidentiality Agreement's arbitration clause, particularly in context with the references to NWS and Castle Harlan.[4]

### B. Equitable Estoppel

As for Castle Harlan's equitable estoppel theory, New York law provides that "a nonsignatory may be estopped from avoiding arbitration where it 'knowingly accepted the benefits of an agreement with an arbitration clause.'"  *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 29 (App. Div. 1st Dep't 2012) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)).  "The benefits must be direct—which is to say, flowing directly from the agreement."  *MAG Portfolio*, 268 F.3d at 61.

---

[4] None of the cases that Castle Harlan cites are to the contrary.  For instance, in *Limonium Mar. S.A. v. Mizushima Marinera, S.A.*, a guaranty contract was held to incorporate by reference a separate charter agreement, where the guaranty contract provided that the "undersigned hereby . . . guarantees . . . the due and faithful performance of the Charterer's obligations under the Agreement . . . , as if the undersigned were primory [sic] obligors."  No. 96-CV-1888, 1999 WL 46721, at *6 (S.D.N.Y. Feb. 1, 1999), *aff'd,* 201 F.3d 431 (2d Cir. 1999).  In contrast, here, there is no language in the Letter indicating that Norcast agreed to step into the shoes of NWS and assume its obligations under the Confidentiality Agreement.

Furthermore, "the party seeking to compel arbitration must demonstrate that the party seeking to avoid arbitration relies on the terms of the agreement containing the arbitration provision in pursuing its claim." *Oxbow*, 948 N.Y.S.2d at 29–30 (citations omitted). "As a general matter, . . . a corporate relationship alone is not sufficient to bind a nonsignatory to an arbitration agreement." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

While the distinctions between a "direct" and an "indirect" benefit are not clear, *see Life Technologies Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011), here in this case, Norcast's claims do not "rel[y] on the terms" of the Confidentiality Agreement, such that it is estopped from denying the applicability of the Agreement's arbitration clause. *See Oxbow*, 948 N.Y.S.2d at 29–30. This case is not at all like cases where a party was estopped from avoiding an arbitration clause because it affirmatively availed itself of the benefits of an agreement containing an arbitration clause in running its business or in litigation. *See, e.g.*, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (accounting firm relied on rights conferred in a settlement agreement in continuing to use the name "Deloitte" and was therefore bound by the agreement's arbitration clause).

Here, the Amended Complaint does refer to Norcast's efforts to keep its information confidential, but it does not rely on the terms of the Confidentiality Agreement or seek to enforce rights thereunder. Castle Harlan's argument for estoppel cites language in the Amended Complaint stating that Norcast and its banker took steps to prevent direct competitors like Bradken from "obtain[ing] confidential or non-public information relating to Norcast through Castle Harlan." (Am. Compl. ¶¶ 25, 31.) These brief references fall well short of asserting rights under the Confidentiality Agreement made between NWS and Castle Harlan. Although Norcast might have attempted to enforce the terms of the Confidentiality Agreement despite the

Agreement's express disclaimer of third-party beneficiaries, it has not done so here.  The gravamen of the Complaint is not that Castle Harlan breached the Agreement, but rather than Castle Harlan improperly concealed its relationship with Bradken when negotiating for the purchase of NWS.  Under these circumstances, Norcast has not sought to avail itself of any "direct benefits" under the Confidentiality Agreement, and therefore it is not estopped from denying the applicability of the arbitration clause therein.

Castle Harlan's cited authority from the Fourth Circuit does not suggest otherwise.  *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (Plaintiff sought damages "in accordance with" the contract containing an arbitration clause).  Indeed, a subsequent decision in that circuit emphasized that *International Paper*'s holding was limited to where the Plaintiff's "*entire case* . . . hinge[d] on its asserted rights under the [contract]." *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 161 (4th Cir. 2004) (quoting *Int'l Paper Co.*, 206 F.3d at 418).  There, the court held that "[e]ven if the [party seeking to avoid arbitration] could have asserted a claim . . . for breaching the general contract, that does not mean [it] cannot bring a case based on extra-contractual duties . . . ." *Id.* at 163 (affirming denial of motion to compel arbitration).[5]  Certainly, Norcast's "entire case" does not "hinge on" any rights that it may have under the Confidentiality Agreement.  Indeed, Castle Harlan concedes that "Norcast has eschewed any claim that Castle Harlan breached the

---

[5] Likewise, courts in other circuits have rejected equitable estoppel arguments where a non-signatory to an agreement did "not seek to enforce a specific term" of the agreement.  *E.g.*, *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 474–75 (5th Cir. 2010); *accord Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1321 (11th Cir. 2013) ("For a party's claims to rely on a contract, the party must actually depend on the underlying contract to assert the claims."); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011) ("[T]he contract must form the legal basis of [plaintiff's] claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them.").

Confidentiality Agreement." (Def.'s Op. Br. 16 n.13).[6]  Accordingly, Castle Harlan has no basis for its conclusion that the Complaint "evinces a claim that Norcast had some kind of expectation or entitlement based on the Confidentiality Agreement."

### III.     Applicability of the SPA's Toronto Arbitration Clause

Castle Harlan's alternative theory that Norcast must arbitrate with it in Toronto pursuant to the SPA is essentially the converse of its theory under the Confidentiality Agreement.  Rather than being a signatory to an arbitration agreement seeking to compel arbitration against a nonsignatory, here, Castle Harlan is a *nonsignatory* to the SPA seeking to enforce its arbitration clause against a *signatory*, Norcast.  Thus, the question is not whether Norcast agreed to arbitrate disputes under the SPA (it did), but whether Norcast must arbitrate *with Castle Harlan*—a nonsignatory to the SPA.  Castle Harlan argues that under principles of agency and estoppel, it may enforce the SPA's arbitration clause against Norcast even though it is not a signatory.

Both of Castle Harlan's theories rely on its close relationship with its subsidiary, BC, which was a signatory to the SPA.  As Castle Harlan points out, the Amended Complaint contains an allegation that "Castle Harlan made all of the [alleged] fraudulent misrepresentations and omissions to Norcast on behalf of its subsidiary, BC." (Am. Compl. ¶ 127.)  It is also clear from the Amended Complaint that Castle Harlan was negotiating for the purchase of NWS, although BC was the entity that would actually purchase the shares and sign the SPA.  (*See, e.g.*,

---

[6] Interestingly, Castle Harlan *also* denies having "assumed any substantive obligations to Norcast when the Confidentiality Agreement was signed" in the same footnote where it argues that "Norcast cannot have it both ways" by both citing and disclaiming obligations under the Agreement. (Def.'s Op. Br. 3 n.3.)  The purpose of equitable estoppel of preventing a plaintiff from "trying to have his cake and eat it too . . . . applies with equal force to *defendant* here." *Different Drummer LLC v. Nat'l Urban League, Inc.*, No. 11-CV-4982, 2012 WL 406907, at *6 (S.D.N.Y. Feb. 7, 2012).

Compl. ¶¶ 30, 59.)  To succeed, however, Castle Harlan's argument must overcome the SPA's provision expressly prohibiting third parties from enforcing its terms.

Castle Harlan's agency theory is unavailing.  Norcast's allegation that Castle Harlan was speaking "on behalf of" BC does not establish the "ability to exercise control . . . [that] is an essential element of agency."  *See Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010); *cf. Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005) (finding agency relationship supported equitable estoppel where "plaintiffs specifically and repeatedly allege that [signatory defendant] . . . acted at all relevant times [as] the agent of [nonsignatory co-defendant]").  Castle Harlan's agency theory is also remarkable in that it effectively seeks to pierce its own corporate veil in order to benefit from a contract that its subsidiary signed.  As the Second Circuit has explained, however, even a close corporate relationship will not pierce the corporate veil unless there has been "a virtual abandonment of separateness," demonstrated by factors such as "an abandonment of the corporate structure" or "an absence of corporate formalities."  *Thomson-CSF*, 64 F.3d at 778.  Neither party has attempted to make such a showing, nor will the Court dispense with "the presumption of corporate independence" to do so.  *See Gen. Star Nat. Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 283 (S.D.N.Y. 2010).  Accordingly, the Court will not override the SPA's express provision "specify[ing] *with whom*" the parties agreed to arbitrate. *See Italian Colors Rest.*, 133 S. Ct. at 2309.

Nor will the Court override that provision on the basis of an estoppel theory, although it presents a somewhat closer question than estoppel under the Confidentiality Agreement.  Castle Harlan is seeking to estop Norcast from denying the applicability of an agreement that Norcast actually signed.  *See Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 211 (2d Cir.

14

2005) (explaining that the distinction is "important" as an "indicator" of the intent of the party seeking to avoid arbitration). Thus, the Second Circuit has held that in certain circumstances, principles of estoppel permit "a non-signatory to an arbitration agreement [to] compel a signatory to that agreement to arbitrate a dispute where . . . 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004). Nonetheless, even under this "intertwinedness" theory of estoppel,

> "[the] relationship among the parties [must] either support[] the conclusion that [the party opposing arbitration] had consented to extend its agreement to arbitrate to [the non-signatory], or, otherwise put, ma[k]e it inequitable for [the party opposing arbitration] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]."

*Ross v. Am. Exp. Co.*, 547 F.3d 137, 146 (2d Cir. 2008) (quoting *Sokol*, 542 F.3d at 361). Thus, application of this theory of estoppel "requires careful justification." *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001).

In one case, the Second Circuit permitted a nonsignatory to enforce an agreement's arbitration clause under the intertwinedness theory of estoppel, even where the agreement also contained "an exclusion of third party rights." *Contec*, 398 F.3d at 209. In that case, however, there was much more than a close, parent–subsidiary relationship between the nonsignatory and the signatory. Indeed, the signatory had *merged into* the entity seeking to enforce the arbitration agreement, which was only in the most formal sense a nonsignatory to the arbitration agreement. *Id.* at 207–08 ("These changes in corporate form did not alter Contec's address or ownership . . . . Contec L.P. . . . has become Contec Corporation."). The court also noted that "the parties apparently continued to conduct themselves as subject to the [agreement containing the arbitration clause] regardless of change in corporate form." *Id.* at 209.

15

Here, in contrast, Castle Harlan is not a successor-in-interest to BC, its subsidiary that signed the SPA. Thus, unlike *Contec*, the circumstances do not indicate that the parties treated Castle Harlan and BC as the very same entity. Indeed, the SPA carefully defined the identity of the "Parties" and carved out specific and narrow exceptions to its provision that "no person, other than the Parties, shall be entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum." Castle Harlan does not assert that it falls within any of these exceptions, but contends that it is entitled to enforce the SPA's arbitration clause notwithstanding the SPA's terms to the contrary.

Given the SPA's clear language, the "relationship among the parties" does not "support[] the conclusion that [Norcast] had consented to extend its agreement to arbitrate to [Castle Harlan]." *See Sokol*, 542 F.3d at 361. Accordingly, the Court may not "override the clear intent of the parties," *Waffle House*, 534 U.S. at 294, but must instead "rigorously enforce" the SPA "according to [its] terms, including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes.'" *Italian Colors Rest.*, 133 S. Ct. at 2309 (citations omitted). Therefore, Norcast is not estopped from denying an obligation to arbitrate with Castle Harlan under the SPA.

Since the Court concludes that neither the SPA nor the Confidentiality Agreement obligate Norcast to arbitrate this dispute with Castle Harlan, there is no basis for subject matter jurisdiction under the FAA, and the Court grants Norcast's motion to remand pursuant to 28 U.S.C. § 1447(c).

## IV.   Norcast's Request for Costs and Attorneys' Fees

Norcast's request for costs and attorneys' fees as a result of Castle Harlan's "wrongful removal" is denied. While remand is appropriate, the Court cannot find that Castle Harlan

"lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).  In light of the two arbitration clauses governing the parties' affiliates in this dispute, and given the lack of clear authority defining the contours of the rights and obligations of nonparties to arbitration agreements, the Court cannot find Castle Harlan's removal of the case to be objectively unreasonable.

## V.    Modification of the Confidentiality and Protective Order

Although the Court has no remaining jurisdiction over the claims asserted in this case, there is another related matter pending before it in case number 11-MC-00251.  There, Norcast requests a modification of the Confidentiality and Protective Order (the "Order"), which governs the use of the discovery materials that Norcast obtained pursuant to the Court's grant of judicial assistance under 28 U.S.C. § 1782.[7]  The Order currently limits the use of those materials to the pending litigation in Australia, and Norcast complains that it would be inefficient to duplicate discovery for the litigation in this case.

In light of the remand of Norcast's claims, the Court agrees that it would be inefficient to require Norcast to duplicate discovery efforts in a jurisdiction that permits broad discovery similar to that of the federal courts.  On the other hand, the Court disagrees with Norcast's contention that it should be permitted to use the discovery materials "for any purpose related to [this case] . . . and any other future proceeding between Norcast and Castle Harlan."  In foreign jurisdictions where discovery is strictly limited, the use of the discovery material at issue here could give Norcast an unfair advantage.  Therefore, the Court modifies the Order to permit the use of the discovery materials in the case remanded to the New York State Supreme Court, to the

---

[7] The parties have, however, filed their motion papers on this issue in this case's docket due to the relatedness of the issues and the identity of the parties.

extent permitted by that court.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is DENIED. Plaintiff's cross-motion to remand the case to New York State Supreme Court, New York County is GRANTED, but Plaintiff's request for associated fees and costs is DENIED. Plaintiff's motion to modify the Confidentiality and Protective Order is GRANTED IN PART to allow the use of the Section 1782 discovery materials in the remanded case, to the extent permitted by the New York State Supreme Court upon remand.

The Clerk of Court is directed to REMAND this case to New York State Supreme Court, New York County, under Index Number 651925/2012.

Dated: New York, New York
       January 6, 2014

                                         SO ORDERED

                                         _____
                                         PAUL A. CROTTY
                                         United States District Judge